# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**JEFFREY C. MCDERMOTT**
**ROBERT S. SCHEIN**
**LIBBY Y. GOODKNIGHT**
Krieg DeVault LLP
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**BRYAN H. BABB**
**STEPHEN C. UNGER**
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEY FOR AMICI CURIAE:

**ROBERT A. DUNCAN**
Norris Choplin Schroeder LLP
Indianapolis, Indiana

FILED
Jun 20 2012, 9:12 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TOWN OF ZIONSVILLE, INDIANA, and ZIONSVILLE PLAN COMMISSION, | ) | |
| | ) | |
| Appellants-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1107-PL-374 |
| | ) | |
| HAMILTON COUNTY AIRPORT AUTHORITY, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-1006-PL-35761

June 20, 2012

**OPINION - FOR PUBLICATION**

**SHEPARD, Senior Judge**

The Hamilton County Airport Authority owns an airport located next door in Boone County, within the Town of Zionsville. The Authority contends that it is not subject to any Boone County zoning or to the covenants it executed to obtain airport zoning from Boone County. The trial court agreed.

The Indiana Supreme Court has held that a general unit of government maintains zoning authority within its boundaries, even as to other general governments. It has also made clear that this authority cannot be employed for abusive or unreasonable interference. Adhering to these principles, we reverse.[1]

FACTS AND PROCEDURAL HISTORY

The Indianapolis Executive Airport is located on 525 acres in Boone County, along its border with Hamilton County. Previously known as Terry Airport, it has operated at that site since the 1950s. Appellee's App. pp. 13, 16. In 2003, Hamilton County purchased the airport. *Id.* at 609-10. In September 2004, the Board of Aviation Commissioners of Hamilton County, predecessor to the Airport Authority, executed and recorded covenants to govern land use at the airport. Appellants' App. p. 25. The Boone County Commissioners and the Boone County Area Plan Commission obliged the Aviation Commissioners to execute these covenants in exchange for creating airport districts as a category of use under the county zoning ordinance and designating the airport site for this purpose. Appellee's App. pp. 625-26.

---

[1] We heard oral argument on May 17, 2012, in Indianapolis and appreciate the helpful presentations by counsel for the parties and for amici curiae.

2

In 2006, Hamilton County created the Airport Authority and transferred to the Authority all of the Aviation Commissioners' assets, including the airport. Appellants' App. pp. 34-40.

In July 2008, the Town of Zionsville, Eagle Township, and Union Township adopted a plan of reorganization that combined the three governmental units into a single entity, known as the Town of Zionsville. The Town thus gained zoning jurisdiction over the former Eagle Township and Union Township in areas where Boone County previously exercised it, including the airport. Appellee's App. pp. 170, 171, 703.

In February 2010, Zionsville's planning director informed the Airport Authority that it needed approval from Zionsville's planning department prior to obtaining construction permits. *Id.* at 627-28. Meanwhile, the Authority had been developing its own land use plan, and it adopted a land use ordinance for the airport in March 2010. Appellants' App. pp. 41-60.

In light of the dispute regarding zoning jurisdiction over the airport, the Airport Authority filed a complaint for declaratory judgment asking the court to determine: (1) that the Authority has exclusive jurisdiction over land use, zoning, and drainage at the airport; (2) that the Boone County Zoning Ordinance and the Zionsville Zoning Ordinance are invalid as applied to the airport; and (3) that the covenants of 2004 are invalid. The Authority initially named Zionsville, the Boone County Commissioners, and the Boone County APC as defendants, but it later dropped the County and its APC. By agreement of the parties, the case was transferred to Marion County. After a hearing on

3

cross-motions for summary judgment, the trial court granted the Authority's motion, denied Zionsville's, and entered final judgment in favor of the Authority. This appeal followed.

## ISSUES

The central issues in Zionsville's appeal are:

I.    Whether, as a governmental unit of general authority, Zionsville has planning and zoning jurisdiction over the airport.

II.   Whether, even if it does not, the covenants of 2004 remain binding upon the Authority.

## DISCUSSION

### I. Standard of Review

The parties agree on the standard of review. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). As with a trial court, a reviewing court construes all factual inferences in favor of the nonmoving party and resolves all doubts as to the existence of a material issue against the moving party. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1270 (Ind. 2009). Questions of law, of course, are reviewed de novo. *Tankersley v. Parkview Hosp., Inc.*, 791 N.E.2d 201, 204 (Ind. 2003).

### II. Applicable Statutes

Zionsville and the Airport Authority necessarily join their competing claims of exclusive zoning jurisdiction by citing the pertinent statutes. When courts set out to

construe a statute, we first look to the language of the statute itself and strive to give the words their plain and ordinary meaning. *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1283 (Ind. 2009). We examine the statute as a whole and try to avoid excessive reliance on a strict literal meaning or the selective reading of individual words. *Id.* We presume the legislature intended the language used in the statute to be applied logically, consistent with the statute's underlying policy and goals, and not in a manner that would bring about an unjust or absurd result. *Id.*

Zionsville notes that the Indiana Code's leading provisions granting general zoning authority over a relevant geographic area assign that authority to "units" of local government and specifically define a "unit" as a county, municipality, or township, not including specialized entities like airport authorities. Ind. Code § 36-1-2-23 (1980). Because Zionsville has adopted a comprehensive zoning ordinance pursuant to the processes the Code prescribes, and because the airport lies within Zionsville's geographic boundaries, Zionsville argues that it has sole zoning jurisdiction over the airport. Ind. Code § 36-7-4-601 (1995).

In response, the Airport Authority contends that it has separate statutory authority to exercise zoning jurisdiction. The list of powers for an airport authority is a lengthy one. *See* Ind. Code § 8-22-3-11 (2001). One of the powers on the list is that the Authority may "fix and determine exclusively the uses to which the airport lands may be put. All uses must be necessary or desirable to the airport or the aviation industry and must be compatible with the uses of the surrounding lands as far as practicable." Ind.

5

Code § 8-22-3-11(16) ("subsection 16," for short). The Authority reasons that the power to control "the uses" of airport property includes the power to control the zoning of airport property. The term "uses" is not defined elsewhere in the statute or by caselaw, and amici Aviation Association of Indiana and various airport authorities ("amici") assert that this case is the first opportunity to interpret the statute.

Zionsville argues that the Airport Authority is making too much of a single phrase in one subsection of the Code. Zionsville says that the Authority's power under subsection 16 "to fix and determine exclusively the uses" of airport property is not synonymous with zoning jurisdiction. That provision does not mention zoning, argues Zionsville, and by its plain language authorizes the airport to determine only "how the Airport land is arranged and configured." Appellants' Br. p. 18.

The Airport Authority also supports its interpretation of subsection 16 by citing Indiana Code section 8-22-3-18.1 (1997), which provides in relevant part:

> This section constitutes full authority for the issuance of revenue bonds. No procedure, proceedings, publications, notices, consents, approvals, orders, acts, or things by the board, by a board, an officer, a commission, a department, an agency, or an instrumentality of the state, or by an eligible entity is required to issue revenue bonds or to do any act or perform anything under this chapter, except as presented by this chapter. The powers conferred by this chapter are in addition to, and not in substitution for, and the limitations imposed by this section do not affect the powers conferred in another section of this chapter or by any other statute.

Ind. Code § 8-22-3-18.1(s). Thus, the Authority reasons, it is not obligated to seek zoning approval from Zionsville or any other entity before carrying out its duties.

6

Zionsville replies by noting that this statute, by its very terms, applies only to matters concerning revenue bonds.

There are, of course, a host of specialized local government entities authorized under Indiana law, variously called districts, authorities, or corporations. The statutes for each of these entities tend to describe their powers in rather robust terms. A public library corporation, for example, may "govern and set policy for all affairs of the public library," acquire and sell real property, purchase and dispose of personal property, establish branches and museums, issue bonds, and borrow money. Ind. Code §§ 36-12-3-3, -4, -5, -9 (2005).

Similarly, local housing authorities may construct, repair, operate, and lease housing projects, investigate slum areas and cooperate with governmental entities in reconstructing those areas, exercise exceptions from taxes and special assessments by state entities and other political subdivisions, and invest their funds, among other powers. Ind. Code §§ 36-7-18-16 (1996), -19 (1998), -20 (1987), -25 (1981). The Code says housing authorities have "all the powers necessary or convenient for carrying out the purposes of this chapter." Ind. Code § 36-7-18-14 (1981).

Likewise, fire protection districts may hire staff, "invoke any legal, equitable, or special remedy" to exercise its powers, enter into agreements with municipalities "located within or outside the district" to fulfill the district's duties, levy taxes, and purchase property. Ind. Code § 36-8-11-15 (2001). And levee authorities, the statutes say, "have exclusive jurisdiction within the [authority's] district" and the power to "adopt

7

ordinances to protect all property owned or managed by the district." Ind. Code § 14-27-6-30 (2001).

The special local entities just cited, and others like airport authorities, share a number of characteristics. First, their enumerated powers often read as rather robust in order to portray a sufficient picture of independence to warrant avoidance of the municipal debt limitations of Article 1, Section 7 of the Indiana Constitution. Second, it is fairly common that these specialized entities are charged with assignments that involve public safety or health or both (like protecting low-income persons through the power of housing authorities to assure "safe and sanitary" dwellings).

Third, a great many of these special entities operate in complex legal environments requiring that they navigate among multiple federal and state taskmasters. Just as airport authorities must interact with the Federal Aviation Administration and the Indiana Department of Transportation, for example, public transportation corporations, Ind. Code §§ 36-9-4-1 to 58, must act in accordance with regulations or grant assurances of the Indiana Department of Transportation, the Department of State Revenue, and the federal Mass Transportation Administration.

Thus, the legal claim of exclusive power advanced by the Airport Authority is one that, with different Code sections and different public purposes substituted, could be deployed by any number of other local government entities.

Whether the statutes granting specialized powers to a particular government entity serve to exclude the land use regulation established by Title 36 was at stake in *City of*

8

*Crown Point v. Lake County*, 510 N.E.2d 684 (Ind. 1987). There, Lake County determined that it should use its former sheriff's home to operate the Community Corrections Program, which it alone could do under Indiana Code article 11-12. The property in question was not appropriately zoned under the zoning and planning ordinances of the City of Crown Point, and the City sought an injunction barring the County from using the sheriff's home without seeking proper zoning from the City.

The Supreme Court observed that land use control is particularly a local function. Cities or counties may develop a comprehensive land use plan to promote the public health, safety, comfort, morals, convenience, and general public welfare. *Id.* at 686 (citing Ind. Code § 36-7-4-501). The reach of the comprehensive plan is broad, including among a great many other facilities "[p]ublic buildings and institutions, including governmental administration and service buildings, . . . penal and correctional institutions, and other civic and social service buildings." *Id.* (quoting Ind. Code § 36-7-4-503(2)(N)). This plan is implemented through local zoning ordinances. *Id.* (citing Ind. Code §§ 36-7-4-601 to 614). In deciding whether such zoning ordinances may regulate the activity of other governmental units, the Court said:

> The general power to regulate zoning does not specifically include the power to require that other political subdivisions comply with zoning regulations. However, a survey of other statutes granting local authority to perform and regulate government functions shows that *none* of the powers delegated to government units contain explicit authority to require compliance by another political subdivision. Thus, while [units] may "regulate the use of public ways," Ind. Code § 36-9-2-7, no specific authorization is given to enforce such regulation on any other political subdivision. Though "a municipality that operates sewage works . . . may

9

require: (1) Connection to its sewer system of any property producing sewage or similar waste; and (2) Discontinuance of the use of privies, cesspools, septic tanks and similar structures," Ind. Code § 36-9-23-30(a), no specific enforcement is provided against other political subdivisions.

Strict interpretation of the limitation that a unit may not impose a duty on a political subdivision without express statutory authority would lead to the conclusion that counties may not enforce speed zones against city employees and cities may not prohibit counties from dumping raw sewage in rivers and streams. "[A]dherence to such strict letter would lead . . . to absurdity." *Zoercher v. Indiana Associated Telephone Corp.* (1937), 211 Ind. 447, 455, 7 N.E.2d 282, 285 (quoting *Stout v. Board of Commissioners* (1886), 107 Ind. 343, 347, 8 N.E. 222, 224).

*City of Crown Point*, 510 N.E.2d at 686 (emphasis in original).

The Court held that the zoning ordinance of Crown Point did apply to the former sheriff's residence which Lake County intended to use for a function delegated solely to the county. On the other hand, the Court also made clear that this did not mean that the City had absolute power to enforce its zoning requirements against all other governmental entities under all factual circumstances:

We conclude that an intruding entity must be allowed to seek relief under some circumstances [but] must . . . bear the burden [of showing] that . . . [such relief] is necessary to advance the governmental ends it seeks. The essential purpose of zoning, "to rationally coordinate land-use planning to promote orderly development and preservation of property values," *City of Fargo*, 256 N.W.2d at 697, generally can best be furthered by local zoning authorities which have been established to accomplish that very purpose. Local zoning proceedings also provide for public debate in an administrative hearing which can address the interests of all parties.

However, there will be occasions when the land use plan of a community must fall before other critical government objectives. The decisions of local zoning boards in any context have been reviewed to determine if they are arbitrary, capricious or patently unreasonable. *Ash v. Rush County Board of Zoning Appeals . . .* , 464 N.E.2d 347 [(Ind. Ct. App. 1984)]. Local land use decisions must be evaluated not only in terms of

10

local need and benefit, but in light of community, area or state-wide interests as well.

When a zoning authority has denied an intruding government's request for approval of a given land use, an appeal can lie to the courts, which will balance the interests to determine which must prevail. Factors to be considered include the propriety of the land use, such as the economic and environmental impact on the area, the kind of function or land use involved, the availability of alternative locations, and any attempts to minimize detriments to adjacent landowners, as well as a consideration of competing interests, such as the nature and scope of the intruding government unit, the essential use to the local community and the broader community, the need for the specific site as compared to the adverse impact, the social utility of the proposed use, and the possible frustration of a government function. These are the sort of decisions assigned to local executive and legislative bodies. Where their determinations are irreconcilable, the legislature has provided for a review of the zoning decision by the judiciary.

*Id.* at 690-91.

The Authority's best argument for standing out from this general legal rule is that subsection 16 says it may "fix and determine exclusively the uses." While this is fairly strong language, in context it also cuts against the Authority's position. In the very Code article authorizing airport authorities, the legislature has elsewhere given these authorities actual zoning authority beyond the boundaries of its own property to the extent that is necessary to assure safe descent and ascent of aircraft. That limited authority belongs to the Authority alone: "The zoning jurisdiction granted in this section is exclusive against jurisdiction granted by any other statute." Ind. Code § 8-22-3-14(d) (1990). Obviously, when the General Assembly intends to confer exclusive zoning authority on a special district like airports it has used language doing so. It is plausible enough to conclude that

11

when the legislature desired to grant airport authorities zoning powers, it did so in section 14(d) and did not do so in subsection 16.

Amici are quite correct that aviation is a central part of the state's transportation framework and of its economic health. Amici observe that Indiana Code section 8-22-3-28(a) (1995) declares that an airport authority's control over "acquisition, establishment, construction, improvement, . . . maintenance, control, and operation of airports . . . is a governmental function of general public necessity and benefit." That judicial review of the sort described in *City of Crown Point* should take serious account of these principles seems self-evident.

### III. The Covenants

Finally, the parties contest a point about the covenants governing uses at the airport, which the Authority's predecessor executed in 2004 in exchange for Boone County's creation of a special airport zoning district. The covenants provide that they "may be enforced by the [Boone County APC], the Boone County Commissioners or such planning authority and municipal corporation as my [sic] subsequently acquire jurisdiction for zoning of the [airport]." Appellants' App. p. 180. Zionsville says that it is Boone County's successor as the general government with zoning control over the geographic area that includes the airport.

The Airport Authority's leading contention about the covenants rests on the idea that when the conversion from an airport board to an airport authority occurred in 2006,

12

Boone County lost its authority to zone the airport and thus Zionsville could not succeed Boone County. Appellee's Br. pp. 25-26.

This contention flows as follows. Section 1 of the covenants states, "Should any provision of the Ordinance be deemed invalid, adjudicated unenforceable, or be amended . . . as of the date of the ordinance, these covenants shall be void and of no force and effect." Appellants' App. p. 178. The Airport Authority asserts that when ownership passed from the Aviation Commissioners to the Authority, Boone County's ordinance became inapplicable (or "invalid") inasmuch as subsection 16 gave the newly-created Authority complete zoning jurisdiction. As we have indicated above, we conclude that subsection 16 does not prevail over the general zoning powers of counties and cities. The covenants are thus not "of no force and effect" on these grounds.

Whether the Authority may gain relief from the covenants on other grounds is therefore left unresolved by this proceeding. The regular rule is that covenants executed during zoning processes bind the contracting parties even when zoning ordinances do not. And a good many of the parties to the present dispute have shared each stage of its development. The airport commissioners who signed the covenants in 2004, for example, became a majority of the Authority's board when it was created in 2006, and the 2006 board members were a majority of the board that adopted the airport's land use ordinance in 2010. The actual airport operator, Montgomery Aviation, has been the same throughout. Appellants' App. pp. 60, 181; Appellee's App. pp. 41, 636, 640, 642.

13

Whether a successful appeal of an adverse zoning decision of the Town would afford the Authority relief from the covenants has not been briefed and cannot be resolved today.

<u>CONCLUSION</u>

We reverse the judgment of the trial court and direct it to enter judgment for the Town of Zionsville.

Reversed.

DARDEN, J., and BARNES, J., concur.